## McClanahan v. McClanahan.

### (*Nashville.* February 3, 1900.)

1. MARRIAGE AND DIVORCE. *Sufficient cause for wife's divorce.*

A wife is entitled to absolute divorce on account of cruel and in-
human treatment that renders it unsafe and improper for her
to cohabit with her husband, or to be under his dominion and
control, where it appears that, on one occasion, he had, with-
out justification or excuse, assaulted her in a brutal manner;
had falsely charged her, before suit, with infidelity to her mar-
riage vows, and had, by cross bill, reiterated that false charge;
had falsely accused her, a white woman of excellent character,
of illicit relations with a hired negro, that resulted in her preg-
nancy; and had, during many years, engaged with her in vio-
lent quarrels, calling her, upon slight provocation, grossly
indecent and offensive names; and had confessed to her his
own adultery on several occasions after marriage; although
she may have in some measure, inexcusably, but not wantonly,
provoked his bad temper and conduct. (*Post, pp. 218–225.*)

Code construed: §§ 4202, 4219 (S.); §§ 3307, 3324 (M. & V.); §§ 2449,
2466 (T. & S.).

2. SAME. *Defense of condonation.*

The general rule that defenses are not available unless they are
presented by plea or answer, is not, it seems, universal in its
application to the defense of condonation of adultery in divorce
cases. Condonation, it seems, will be available, though not
relied on in the pleadings, if it appears in the proof that the
injured party, with full knowledge of the facts, has forgiven
the offense, or has procured or connived at its commission.
But our statute, which requires the complainant, seeking di-
vorce on account of defendant's adultery, to show by affirma-
tive proof, in the absence of any plea or answer, that there
has been no condonation dispenses with pleading the fact in
any case. (*Post, pp. 225, 226.*)

Code construed: § 4213 (S.); § 3318 (M. & V.); § 2460 (T. & S.).

Cases cited and approved: Cameron v. Cameron, 2 Cold., 375; 18
N. J. Eq., 33; 31 N. J. Eq , 225; 4 Paige, 433; 9 Ind., 105; 24
Ore., 416; 39 Ala., 348; 39 Wis., 651.

McClanahan *v.* McClanahan.

3. SAME. *Same.*

The Court will not, *mero motu*, without pleadings, raise the defense of condonation, even where it might. if pleaded, be legally available in order to defeat the wife's suit for divorce against a recusant and ruffianly husband, who confessed adultery, and is shown to have assaulted his wife with brutal violence; to have falsely assailed her virtue by the grossest charges of lechery and immorality; to have slandered her vilely; and to have treated her with gross indignity and great cruelty. (*Post, p. 227.*)

4. SAME. *Same.*

Condonation is not a valid defense to the wife's suit for divorce on account of such cruel and inhuman treatment of the husband as renders it unsafe and improper for her to cohabit with him, or remain under his dominion and control. (*Post, pp. 227–232.*)

Cases cited and approved: Thomas *v.* Thomas, 2 Cold., 124; 116 Ill., 509; 34 La. Ann., 301; 39 La. Ann., 491; 2 Paige, 110.

FROM   WILLIAMSON.

Appeal from Chancery Court of Williamson County. H. H. Cook, Ch.

E. H. East, Bell & Gordon, and Hearn, Mc-Corkle & Lane for M. O. McClanahan.

Pitts & Meeks, H. P. Fowlkes, and J. H. Henderson for W. B. McClanahan.

Beard, J. The original bill in this cause was filed by Mrs. McClanahan praying a decree for divorce from her husband upon the ground of

McClanahan *v.* McClanahan.

such cruel and inhuman treatment as to make it unsafe and improper for her to cohabit with him. The defendant answered the bill, denying its allegations of cruelty, except as to a specific act, which he admitted, but averred that it was provoked by complainant, and was afterwards forgiven by her.

Subsequently, the defendant filed a cross bill, in which he charged complainant with adultery in 1888, and again in 1897. This was answered by the cross defendant with an indignant denial of all its averments. Upon these pleadings an immense record, consisting of about 2,400 typewritten pages, has been made up. We are saved, under the statute, the. necessity of going through the evidence in the cause save as . it is embraced in the opinion of the Court of Chancery Appeals. That Court finds that these parties were married in 1882; that at the time of the marriage the complainant was the owner, in fee, of a small tract of 130 acres of land, and in remainder of a 700-acre tract, the life estate of which fell in in 1894; that of personalty, the wife brought to the marriage about $1,500 or $2,500, and the husband about $2,500; that some time after the marriage the defendant gave up his vocation as a traveling salesman, and devoted himself to the management of his wife's real property, in which he had met with reasonable success, having from time to time improved it in a valuable way,

McClanahan *v.* McClanahan.

and all the time having furnished his family with a comfortable home.

The opinion of the Court also discloses, notwithstanding these evidences of material prosperity, that discord, extending over many years of their married life, and up to their final separation, apparently intensifying with the increase of time, existed between the two. Quarrels, originating generally with regard to the property, or rather his management of it, frequently took place. In these she often applied epithets to him, stinging in their nature, and, as coming from a woman, sometimes coarse, and he would reply always with usurious interest, characterizing her with foul and indecent names, and charging her with infidelity to her marriage vows. It is apparent that complainant was possessed with the idea that her husband was mismanaging or misapplying the estate which she chiefly brought to the family. She often complained of this to him. But it is also true that on these occasions his resistance to her complaints rapidly passed into recrimination which far exceeded the offense, and was as gross as it was unmanly.

It is reported by the Court of Chancery Appeals that the "husband and wife both prove excellent characters for truth and veracity; that the wife's character, in all respects, as a cultivated and refined lady, is sustained by a number of witnesses; that the weight of the proof is, how-

McClanahan *v.* McClanahan.

ever, that she is a lady of high temper, and this her own evidence demonstrates." It may, with entire confidence, be added, upon the finding of facts by that Court, that it is equally clear that the husband's temper was high, and in indulging it he often passed beyond the limit of decency, and became, in his turn, a violent and obscene assailant of the virtue of the mother of his children.

This much in the way of the general facts. Now as to specific facts found by that Court. After making certain general observations as "affording a standpoint from which to view the case," the Court then proceeds, to use the language of the opinion, "to state the following facts established by the evidence." These findings are then classified, and are embraced in paragraphs which number from one to fifteen. Many of these findings of facts have already been summarized by us. Others bearing in an important degree on this unfortunate controversy will now be given in the words of the Court, or in paraphrases that will not affect their meaning:

"12. In December, 1896, he inflicted physical violence upon her by jerking her by her hair out of a chair on the floor while she had her baby in her lap and in doing so he pulled out some of her hair. He admits that he jerked her out of the chair by her hair while she held her babe, and upon the floor, but he denies that he

pulled out any of her hair. He did on this occasion, pull out some of her hair, but not so much as was claimed, but the quantity pulled out was immaterial, save as illustrating the ferocity of the assault. As soon as she escaped she went upstairs, and had herself locked in the room of Miss Lulu Swaree. He soon followed. He was admitted on promise to offer no more violence. She and Miss Swaree and a negro girl (nurse) say, in substance, that after he got in the room he called his wife a —— —— (foul name not here repeated), and told her if he could have got a poker he would have killed her with it. He denies this, and says, on the contrary, that he begged her pardon, told her he had disgraced himself and the children, and that he did it under an impulse of anger caused by her charging him with stealing some money. She says she gave him no provocation for the assault. . . After this she cohabited with him and submitted to his conjugal embraces."

Again, that Court says: "She charges that in September, 1897, she and two of her boys came to Nashville, and were after dark getting home, and that he, before her return, in the presence of Miss Swaree and her little girl, called her all sorts of vile names, and said that she went to a bawdy house in Nashville, and left her children asleep in the vehicle in the livery stable, and became so violent that Miss Swaree had to

order him out of her room; that when she got
home one of her little girls told her about what
her father said . . . that he, in effect, ad-
mitted it, and charged her with infidelity in
Nashville. He bitterly denies this charge, and
says that all he said, in substance, was, that it
was improper to remain out so late; that it
would cause gossip or talk. While it is quite
probable," adds the Court, "that what was said
by him on this occasion is considerably colored
or exaggerated, the weight of the proof does es-
tablish . . . that he suggested that she was
not what she ought to be as a wife."

Again, says the Court: "She introduces proof
to show that he accused her with being too inti-
mate with a negro man hired on the place, and
says herself that he accused her of it. She also
introduces proof to show, and says herself, that
a child given birth to prematurely by her in a
miscarriage, was charged by him to be the prod-
uct of sexual intercourse with a negro. He de-
nies these charges *in toto* and in detail. She
continued to live and cohabit with him after
these charges."

In other words, the Court finds that he made
this terribly offensive charge, but clearly implies
that subsequent cohabitation by the wife with her
husband was a condonation of the offense. It is
true that in answer to the petition for a further
finding of facts, that Court says that it has

some doubt about this charge, but does not re-cede from its original finding.

"13. The husband was guilty several times with one or more women, of adultery after marriage. He admits it, but says he told his wife about it, begged her forgiveness, received it, and prom-ised to abstain in the future, and that she con-doned these offenses. She says that she caught him in improper relations with a woman on the place, and that he told her it was no use to try and get a divorce, because she could not prove it; that he and the woman would deny it, and that there would be two against one."

Whatever may have produced their differences, whether property or something else, it is surely not remarkable that when confessed adultery is added to contumelious epithets showered upon her; to his violent assault involving her babe as well as herself; to the charge as to her infidelity in Nashville, and to his yet more loathsome charge of lechery with a negro, that, with ungovernable rage she should, from time to time, have broken out into fierce denunciations. Any one of these grievances was sufficient to arouse anger in the meekest of women, but all were sufficient to con-vert this wife into a demon. That any refine-ment should have remained to her after her long association with such a husband causes profound astonishment.

That Court, on these and other facts, which

have been summarized by us, brought forward into an elaborate opinion, concludes that complainant would be entitled to a divorce except for the fact that she cohabited with her husband up to a short time before the filing of her bill. This was held to be a condonation of his numerous offenses so as to exclude her from a divorce and from all save the most meager relief.

Before coming to the question of condonation, and its effect upon complainant's claim under the original bill, we will briefly dispose of the case made by the cross bill filed by the husband charging the wife with adultery in 1888 and 1897. In doing so it is sufficient to say that the Court of Chancery Appeals finds that the charge of adultery is not sustained by the evidence, and the cross bill was, thereupon, dismissed.

Returning now to the original bill, we agree with the Court of Chancery Appeals that the facts found warrant a divorce to the wife, leaving for determination the question whether, on this record, it should be granted. In other words, finding, as is done, that this husband was guilty of cruel and inhuman treatment such as to render it unsafe and improper for her to cohabit with him, shall the wife be repelled under any well-settled rule of condonation?

In the first place it may be remarked the defendant does not rely on the defense of condonation in his answer to the original bill.

20 P—15

The general rule is that a complainant must recover, if at all, on the case made in his bill, and the defendant cannot avail himself of any defense not set up in his answer. This rule has been applied by many Courts in divorce cases. In *Jones* v. *Jones,* 18 N. J. Eq., 33, the Court held that the defense of recrimination must be set up by special plea or answer. In *Warren* v. *Warren,* 31 N. J. Eq., 225, the Court said: "To enable a defendant to avail himself of condonation, he must set it up either by plea or answer." To the same effect is *Smith* v. *Smith,* 4 Paige, 433; *Lewis* v. *Lewis,* 9 Ind., 105.

It is true the maxim, "A cause is never concluded against the judge," applies peculiarly in divorce cases. Bishop on Mar., Sep. & Div., vol. 2, sec. 663. So, in a case where adultery is the ground of divorce, even in a jurisdiction where the rule is that *stricti juris* condonation must be relied on in plea or answer, yet, where it appears in proofs properly taken, that the injured party, with a full knowledge of all the facts, has actually forgiven the injury, or where it appears that the adultery was committed by the procurement or with the connivance of complainant, a Court will decline to dissolve the contract. *Smith* v. *Smith.* supra; *Hill* v. *Hill,* 24 Ore., 416; *Ribet* v. *Ribet,* 39 Ala., 348; *Dutcher* v. *Dutcher,* 39 Wis., 651.

In such a case our statute, sec. 4213 of the

(Shannon's) Code, as construed in *Cameron* v.
*Cameron,* 2 Cold., 375, makes a rule *sui generis,*
in that it requires complainant, by affirmative
proof, in the absence of plea or answer, to show
that there has been no condonation. But it is
not so provided where the divorce is asked on
the ground of cruelty. So it might be argued
with some plausibility that with the single excep-
tion of the defense of recrimination by a hus-
band (sec. 4219, Shannon's Code), it was the
legislative intent that these cases should be con-
trolled by the general rule of practice.

But, however this may be (and it is here im-
material), is this a case in which a Court should
*mero motu* raise this defense for a recusant and
ruffianly husband? The complainant is the mother
of five children, all young, and one at the time
of the separation an infant, and her whole estate
had passed under the dominion of the defendant.
The last of the great affronts, to wit, that in
charging her with leaving her children in a liv-
ery stable, and visiting a house of prostitution
in Nashville, with a paramour, was put upon her
only a few weeks before she abandoned him, her
home, and family, immediately after which she
filed the present bill.

"A wife's cohabitation," says Mr. Bishop, in
Mar. Div. & Sep., vol. 2, sec. 306, "with her
husband, after he inflicted the last act of cruelty
of which she complains, will not, necessarily, in

all circumstances, bar her suit." Condonation is not an absolute term which can be applied alike to all circumstances. Its application will vary as the offense said to have been condoned may vary. If the offense be adultery, then knowledge of the fact by the complainant, followed by cohabitation, is *ipso facto* condonation. But if, for instance, it is habitual drunkenness on the part of the husband, which is the ground for the application, when does condonation from cohabitation take place? The term "habitual" implies growth through various and increasing stages, until drunkenness became a fixed or established habit. Until this degree is reached it is not a ground for divorce. Could it be, with any show of reason, maintained that when this degree is reached the wife would be repelled because she had remained loyally with her husband, suffering, and yet striving to save him, until the final crisis is reached? Unquestionably not. So of cruelty. As was said in *Collins* v. *Collins,* 10 Scotch Sess. Cas., 4 Sar., 250, cruelty is cumulative, admitting of degrees and augumenting by addition, so that it may be condoned, and even forgiven, for a time, and up to a certain point, without any bar, in sense or reason, to bringing it all forward when the continuance of it has rendered it no longer condonable."

Cruelty, extending through a series of years, must consist of numerous acts, many of which might

and possibly would be of themselves of a char-
acter not to warrant a divorce, yet constantly re-
curring they would indicate a wicked mind, and
taken altogether would show that the condition of
the sufferer was unsafe and beyond the point of
further forbearance.

In *Scott* v. *Campbell,* a Scotch case found in
footnote 6 to Sec. 304, Vol. 2, of Bish. Mar.
Div. & Sep., it is said: "Separation from bed
and board, upon the head of maltreatment, was
for the most part founded on the multiplicity
and renewing the acts of maltreatment, and there-
fore the continuing of cohabitation was never a
good defense against this separation. For one or
two acts might not be sufficient, and yet a · com-
plication was, because it demonstrated a continu-
ance of the malevolous mind, and therefore these
acts of maltreatment were always conjoined, though
there be an interim cohabitation in hopes of
amendment. And if it were not so, there could
be almost no separation on the head of maltreat-
ment; for the acts consisting in a tract, it nec-
essarily supposed an interim cohabitation, and was
very different from the case of divorce on the
head of adultery, because there one act is *violatio
fidei conjugalis,* and therefore cohabitation after
knowledge thereof was understood to be a tacit
remission, which was very different from mal-
treatment." In other words, endurance of illtreat-
ment is no bar to a wife's suit, and raises no

presumption against her. *Sharpe* v. *Sharpe,* 116 Ill., 509; *Terrell* v. *Boarman,* 34 La. An., 301; *Mack* v. *Handy,* 39 La. An., 491. As was said by Chancellor Walworth, in *Wood* v. *Wood,* 2 Paige Ch., 110, "condonation by implication from the fact of cohabitation, ought not to be held a strict bar against the wife. She is in a measure under the control of her husband. And this distinction will be found running through all the English cases on the subject." Citing *D'Anguillar* v. *D'Anguillar,* 1 Hagg., 706; *Kirkwall* v. *Kirkwall,* 2 Consist. Rep., 279; *Best* v. *Best,* 1 Adams, 411.

That mere endurance will not bar, has been recognized, at least by necessary implication, in this State. In *Thomas* v. *Thomas,* 2 Cold., 124, the wife was refused a divorce on the ground of adultery, because of cohabitation after knowledge of the fact, but she was granted a decree on the ground of cruelty, although she remained under his dominion and in conjugal association with him until four months before the litigation began. In *Lyle* v. *Lyle,* 86 Tenn., 372, the complainant and defendant intermarried in 1876, and lived together until a little while before the wife filed her bill for divorce, yet the Court did not permit this to militate against her. It was found "that the defendant's course of conduct toward the complainant was habitually such; from soon after the marriage until complainant left him, as to render her

condition intolerable and force her to withdraw," and divorce was therefore granted.

We are satisfied that this limitation upon the doctrine of condonation, when applied to a case like the present, is in accord with the best authority, the practice of this Court, and is most consistent with sound reason and a wise public policy.

Under § 4202 of the (Shannon's) Code, where "the husband is guilty of such cruel and inhuman treatment or conduct towards his wife as makes it unsafe and improper for her to cohabit with him, and be under his dominion and control," or "where he has offered such indignities to her person as to render her condition intolerable, and thereby forced her to withdraw," it is within the discretion of the Court to grant a divorce from bed and board, or from the bonds of matrimony. It is also provided by § 4219 (Shannon's Code) that "if the cause assigned by the wife for a divorce be any of those specified in § 4202, the defendant may make his defense by insisting upon and proving the ill conduct of the complainant as a justifiable cause for the conduct on his part complained of."

In the examination of this cause we have had in mind these two sections of the Code, and in doing so have given full measure to the husband's insistence that the outbreaks on his part were largely the result of the angry impatience

of the wife at his management of the property which she brought to him, yet we find in this no excuse for the brutality and obscenity that habitually marked his conduct on these occasions. And we are satisfied that it is in the interest of well ordered society, of the wife and of the moral future of the children, that this marriage be dissolved by a divorce *a vinculo*.

The decree of the Court of Chancery Appeals is reversed, and a decree will be entered in this Court affirming in every respect the decree of the Chancellor.

The cause will be remanded, so that the Chancellor from time to time may prescribe such rules, as in his discretion may seem wise, under which defendant may see his children. The costs of the Court below will remain as adjudged by the Chancellor, and of the appeal will be paid by the defendant and his sureties.